IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) ) ) v. ) ) WILLIAM JASON TAYLOR ) ) | Criminal **No. 3:25-592** |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned Assistant United States Attorneys, submits this memorandum in advance of William Jason Taylor's sentencing and recommends that this Court impose a guideline sentence of **twelve months and one day**. The Government's request is based primarily on the need (1) to reflect the seriousness of the offense, (2) promote respect for the law, and (3) afford adequate deterrence to this type of criminal conduct, both general and specific. The Government's recommendation also considers Taylor's favorable personal and work histories, both retrospectively and prospectively.

I.   **BACKGROUND**

On April 16, 2025, a grand jury returned a six-count Indictment against Taylor, charging him with violations of Title 18, United States Code, Section 1030 (Unauthorized Computer Access). All the counts addressed separate instances in which Taylor accessed his former employer's computer network and manipulated the levels of chemicals flowing to a chicken processing plant. Taylor pled guilty to Count 1 on July 23, 2025.

II.   **FACTS**

Taylor was employed in a Senior Electronics Customer Service Support position by ChemStation, a chemical company providing process-oriented assistance to various manufacturing

1

companies. One of those companies was Pilgrim's Pride, a chicken plant in Sumter, South Carolina. Taylor had access to several software systems monitored by ChemStation for the benefit of Pilgrim's Pride.

ChemStation installed an electronic backdoor access into the Pilgrim's Pride facility to allow its employees to monitor and adjust chemicals remotely. Chemicals provided by ChemStation included *peracetic acid* and *sodium hydroxide*. These chemicals are used to sanitize the chicken carcasses as well as the production line and can be harmful to humans at certain concentrations.

In June 2023, Taylor was released from ChemStation after a chemical release at a chicken plant in Georgia caused a partial shutdown and posed a hazard to workers on the line. In late July, he lost his health coverage. He was disgruntled and felt that he had been wrongfully let go.

Taylor used a cellular network modem to access Pilgrim's Pride's computers and to manipulate the flow of chemicals into its Sumter facility. On several occasions, he decreased the flow of peracetic acid such that the chickens and the facility would receive less of the cleaning solution. On one occasion – August 7, 2023 – he caused a spike in chemicals, which posed a potential health hazard to those on the line. Taylor also shut off the alarms that would have alerted Pilgrim's Pride of the chemical imbalance and changed the email accounts of those to be alerted so they would not receive these messages. The change in peracetic acid levels posed a potential threat to public health or safety.

III.    **OBJECTIONS**

Taylor has filed numerous objections to his presentence report ("PSR"). The Government agrees with the responses provided by the U.S. Probation Office and will briefly address them below.

1. <u>Objection to PSR ¶ 34, 45, 46:</u> Taylor objects to the use of his title, "Senior Electronics Customer Service Support" and suggests instead that he be labeled a "Project Manager." The Government attaches significance to his job skills and duties, regardless of title. "Project Manager" appears to be a shorthand way of referring to the job into which he was hired.

2. <u>Objection to PSR ¶ 35</u>: Taylor objects that he was fired from ChemStation for overriding safety controls. He argues that he was fired for failure to power down equipment. As with the dispute over his job title, above, this objection has no impact on his guideline's calculations. The Government suggests the Court make a note of Taylor's position for the record and move on.

3. <u>Objection to PSR ¶ 36:</u> Taylor objects to the recitation of events in Paragraph 36. The Government has attached the FD-302 of Brandon Hunter to corroborate the PSR. *See* Attachment A.

4. <u>Objection to PSR ¶ 43, 58:</u> Taylor objects to the application of the Sophisticated Means enhancement found at USSG § 2B1.1(b)(10)(C). Application Note 9(B) defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." "[A]n enhancement can only be applied when there is proof of complexity beyond the 'minimum conduct required to establish [fraud] in its simplest form.'" *United States v. Savage*, 885 F.3d 212, 228 (4th Cir. 2018) (internal citations omitted). However, a defendant need not use "the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) (*citing United States v. Madoch*, 108 F.3d 761, 766 (7th Cir. 1997)).

3

Courts have applied this enhancement to offenses where a defendant hacks into computer systems. *See e.g. United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011) (affirming § 2B1.1(b)(10)(C); enhancement where defendant repeatedly hacked into university computer system to change grades using stolen usernames and passwords); *United States v. Waithe*, 150 F.4th 16 (1st Cir. 2025) (applying "sophisticated means" enhancement where defendant hacked into Snapchat accounts to obtain nude photos). The Government's position is that the unauthorized access to ChemStation's cellular network modem through Taylor's rescinded credentials, the manipulation of various inputs to change the flow rate of chemicals to Pilgrim's Pride, and the disabling of alarms and scrambling of email addresses to avoid detection all show a scheme sophisticated in terms of means and obfuscation. The interwoven pieces are consistent with the examples provided in the application note, and the enhancement should apply.

5. Objection to PSR ¶ 43: Taylor objects to the application of the "conscious or reckless risk of…serious bodily injury" enhancement found at USSG § 2B1.1(b)(16)(A). The Government enunciated at the change of plea hearing that "the change in peracetic acid levels posed a potential threat to public health or safety," and Taylor agreed to that representation. *United States v. Lemaster*, 403 F.3d 216 (4th Cir. 2005) ("courts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy"). Furthermore, Taylor underwent training and was issued protective gear to avoid injury from exposure to the chemicals. As found in Attachment A, part of the Coastal plant was evacuated when the level of chemicals was too high. Finally, in anticipation of a potential trial, the Government solicited a report

from the United States Environmental Protection Agency, National Enforcement Investigations Center, to address the potential harm posed by these chemicals. The first line of that report reads, "Manipulation of the concentration of ChemSan RBR-XL may cause the product to be less efficacious in reducing food borne pathogens at low concentrations or could result in adverse health effects in the workers if high concentrations are used." *See* Attachment B. Therefore, this enhancement is appropriate.

6. <u>Objection to PSR ¶ 59</u>: Taylor objects to Pilgrim's Pride being characterized as "critical infrastructure" under USSG § 2B1.1(b)(19)(A)(i). Application Note 15(A) defines "Critical Infrastructure" as a system [] and asset [] vital to…economic security, public health or safety, or any combination of those matters. A critical infrastructure may be publicly or privately owned." The Government agrees with the U.S. Probation Office that Pilgrim's Pride was a private entity involved in food production, and that the health and safety of the food it produced impacted the public. It is one of the world's largest poultry producers and is comprised of over 61,000 employees across the globe. Pilgrim's, About Us, https://www.pilgrims.com/about-us/ (last accessed October 29, 2025). In fact, according to their website, 1 out of every 6 chickens in the U.S. comes from Pilgrim's. *Id.* Taylor hacked into a global company's operations that had potential to impact Pilgrim's food production, its employees, and global network.

7. <u>Objection to PSR ¶ 45, 46, & 62:</u> Taylor asserts his activities did not require a "special skill" as found in USSG § 3B1.3. Application Note 4 suggests that a "special skill" is one "not possessed by members of the general public and usually requires substantial education, training or licensing." The U.S. Probation Officer's response found at pages

6 and 7 of the Addendum does an excellent job of outlining Taylor's responsibilities as conveyed by Brian Golbus, president of ChemStation, as well as by Taylor during his FBI interview. The case law cited further supports the proposition that a special skill can be acquired during job performance and does not require special licensing or schooling. The Government would only add that a member of the public with the intention of carrying out a similar scheme in a similar fashion would have no idea where to begin.

IV. **18 U.S.C § 3553(a) SENTENCING FACTORS WARRANT A SENTENCE WITHIN THE GUIDELINES RANGE**

The USPO properly calculated the guideline range of twelve to eighteen months. The Government believes a sentence of **twelve months and one day** is an adequate sentence considering the sentencing factors.[1]

The sentencing statute, 18 U.S.C. § 3553(a), requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[2] According to the revised sentencing scheme promulgated by and in the wake of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the district court must first calculate the advisory Guidelines range and then consider the factors set forth in §3553(a). The Government will discuss the most relevant factors below.

    a. <u>The nature and circumstances of the offense and the history and characteristics of the defendant.</u>

---

[1] The Government would note that, should the Court grant one or more of Taylor's objections, its position remains that twelve months and one day incarceration is the appropriate sentence.
[2] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

Taylor deliberately manipulated chemicals using his withdrawn ChemStation credentials. In doing so, he jeopardized public health. Along the way, he circumvented controls designed to limit the severity of any system failure such as alarms and notification systems. In doing so, he exposed Pilgrim's Pride workers to health risks, and he subjected Pilgrim's Pride to economic damage from distributing a contaminated product. His actions were ill-considered, as he has acknowledged by characterizing them as a "silly joke," but he was in a unique position to assess the damage his actions could cause. Any reflection on his part would have revealed the riskiness of his "joke." Surprisingly, this was not a one-off event – the Indictment demonstrates six occasions spanning over a week when he repeated his "silly joke." Interestingly, this "silly joke" was not aimed at ChemStation, his former employer. It was aimed at Pilgrim's Pride, a company that had no affiliation with Taylor other than ChemStation.

He claims this was out-of-character for him and likely driven by frustration over being fired, but his repeated actions crossed the line between harassing a former employer and endangering an unknowing public.

> b. <u>The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.</u>

The sophistication and severity of the offense call for a custodial sentence. Taylor's recklessness exposed Pilgrim's Pride's employees to a health hazard, had the potential of sickening members of the public, and could have undercut the company's economic well-being. The crime is worsened by its duration and the apparent lack of reflection by Taylor.

This prosecution has rightly gained the attention of the public. People buy meat and produce every day, and in doing so, they trust that systems are in place to prevent them from becoming ill. Taylor undermined that trust, and had his scheme metastasized, it would have

damaged Pilgrim's Pride as a brand and caused it economic hardship for some time.

The Government is satisfied that Taylor will not do this again, but computer hacking has become an everyday occurrence. Some hacks are more consequential than others, and those who cross the line from mischief to malice should know that criminal sanctions will follow. A custodial sentence would promote general deterrence in this way.

## V.     CONCLUSION

For all the above reasons, the Government urges this Court to sentence Taylor to twelve months and one day in prison. A custodial sentence will reflect the seriousness of the conduct, promote respect for the law, and provide adequate specific and general deterrence.

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By:   */s/ Winston D. Holliday, Jr.*
       WINSTON D. HOLLIDAY, JR. (#7597)
       ELLE E. KLEIN (#12941)
       Assistant United States Attorneys
       1441 Main St., Ste. 500
       Columbia, SC 29201
       (803) 929-3000

October 30, 2025